This is our second case in the morning, 410-0338, in re Estate of Weeks. We'll go to the appellant, Mr. Brucker, for the appellate, Ms. Welch. You may proceed. Thank you. Good morning, Your Honor. May it please the Court, This is an appeal from an order entered by the Honorable Stephen R. Pacey in the Circuit Court of McLean County on February 18, 2010, 11th Judicial Circuit, whereby the trial court reduced, in a probate manner, reduced the executor's fees and the attorney's fees in this particular case. We believe that the order was an abuse of discretion on the part of the trial court, and also the fact that the trial court relied upon an erroneous conclusion of law, primarily relying on the Goldfarb case as opposed to the Parlier case or the Morgan Washington Home case, which we believe is precedent in the 11th Judicial Circuit. There was some mention of standing in this by counsel. Whether or not we had standing, we believe the notice of appeal, signed by myself as the attorney for the executor and the estate, was informed that we were appealing the executor's and attorney's fees and that they were being challenged on this appeal. Also, we believe if there was any misinformation on that part, that was nothing more than a technical misnomer pursuant to the Weber and Corona case. The core of this matter is the trial court, we provided testimony that when we do, I've been a lawyer for 31 years at the time of trial, 33 now, or 32 now, and the trust officer, the executor of this estate, had been a trust officer of the bank for 16 years, and when we do a 706 return, when we have a large estate, which in this case was a $4 million estate, and we have to do a 706 return for the IRS, there's a lot of work to be involved in that particular situation when we have to file a 706 return. In this large estate, we had 390 acres of farmland that had to be sold prior to the timely filing of that 706. We had a farmstead whereby the tenant who was in that farmstead for years and years and years had the option on the will to go ahead and purchase that land, the farmstead itself. We also had a house in Normal, Illinois, where my client, the decedent was a disabled person, so he lived in a house in Normal. He had an automobile that had the chairlift and everything else the executor had to sell. We had out-of-state beneficiaries under the will. The executor had to go ahead and provide him with the personal property under the will, and it was, in our opinion, whenever we have to do, over my years of experience, when we have to do a 706 return, there's a lot to do. Part of that is getting appraised values of everything, all the assets of the decedent, farmland, the van, the house, everything we had to get an appraised value in order to attach to that 706 return. That takes a lot of time and involvement. When we do these things, when we see a large estate like that, people say, well, why don't you go back to the hourly basis. Well, the hourly basis, we didn't know at the time the executor and I sat down, we decided on the 3% of the gross estate. We didn't know how we were going to do the farmland. The executor generally has, in our experience, two ways of going. Sometimes we do what we call a seal bid auction, where I know people that I see in the grocery stores every day, farmers out there who are adjacent to this ground. They'll say, hey, Tom, you got any farmland available coming up through estates? I've handled seal bid auctions for 20 years. It's customary in McLean County and other areas. Personal note, we bought some farmland in McLean County where an attorney in McLean County actually did another seal bid auction back in 98. It's customary to do that kind of thing, a seal bid auction, or go out and hire an auctioneer, a regular auctioneer. I only charge 3%. In this particular case, I charged 2% to do that extra work on the estate. We consider it to be extra work any time we have to go beyond the matters of the estate itself. If the executor says, okay, Mr. Brooker, I want you to go out and do that seal bid auction, then we'll do that seal bid auction. We charge extra for that seal bid auction because we don't have to do it. If he wanted to go out and get an auctioneer, he could charge that. That would be something extra charged to that estate. How much would that be? Generally, the testimony of the trial would be 3% to 5% of whatever the land brought. We believe, just like in the Thorpe case which we cited, we sold this land and we got over $1,200 more per acre than what the appraised value was. We feel we did the estate justice by getting that extra amount, and we only charged 2%. Like I said, the other person could have charged 5% if the executor went out and had an auctioneer. We believe we've got a good result, which is one of the criterias when you're looking at a reasonableness of the fee. We've got a good result for this estate. We had a lot of work to do. The house in Norma, for example, we got in there and we found out the basement wall was caving in. We had one appraisal come in, and he didn't even look at the wall. The executor and I talked, and the executor was involved in this case. He went over and I think the testimony was he even cleaned the gutters out of this house in order to try to sell it. The house is in pretty bad shape with a disabled person living in there. And so I told the executor we had to get another appraisal because that appraisal is not going to work and sell the house. And so that's one of the things we had to do. So I guess in the whole body of the work, in order to put everything together for the 706 return, and keep in mind the 706 return on Schedule J they have a deduction for our attorney's fees and executor's fees. And if we're way out of line, way out of line, they're going to come back. The IRS is going to come back and say, wait a minute, these fees are too outrageous. I got approval on the 706 return based upon our fees being reasonable. They never objected to that situation at all. Or the executor's fees. And in doing those 706 returns over the years, I know what is reasonable and what is not in that sense, and I know what the IRS is going to accept. This large of a state with a $4 million estate, these fees were not unreasonable. We had an expert witness come in. Why is the 3% fee in part assessed against non-probate assets? Because the non-probate assets also have to be encapsulized in the 706 return. So we consider that to be something we have to go out and account for the non-probate assets on the 706 return as well. And so we consider that. If there's a problem out there... So it would have been harder to do your 706 return based upon $3 million versus $4 million? Because there's about $1 million in non-probate assets. The $4 million is what's on the 706 return. I guess I'm not understanding your question. Well, the non-probate assets pass like payable upon debt. I understand they're part of the taxable estate, but I don't understand if you file the form based upon $3 million versus $4 million, why that would make it more complicated. It would justify the percentage being charged against the non-probate assets. Because the 706 requires you to put in those non-probate assets. Right, you list them in there. But other than that, that's really the only thing you do pertain to the non-probate assets, isn't it? And yet you're charging 3% for, in essence, just listing them on the form and then applying the rate and submitting it to the IRS. In this particular case, those assets were quite large. But a lot of times those assets aren't large. I don't know if I can explain myself, but it's a catch-22. Well, what if the non-probate assets are certificates of deposit payable on debt to the same person and all in the same bank? And it's a significant amount of money. And all that has to be done is to note them. You know they exist, the person receives them, accepts them, they're paid out, and yes, they have to be part of the IRS form. But what is it that has to be done that justifies 3% of $500,000 worth of certificates of deposit? Personally, in my years of experience as a lawyer, I would probably take a good look at that and say, you know, if that's all we had to do, then that probably would not be the... The 3% is not set in stone as to every case. I mean, it's just when we look at... So we say, okay, what do we have to do? What do we have to do to get that 706 around? And that's when we decide, okay, if we have a lot of assets to get and everything else and farmland to sell and everything else, then that's where we get that 3%. If it's not much there, then I probably wouldn't charge 3%. So it could even be small assets, but you have to handle. That's right. If it's like a van or a house that's deteriorated. Yeah, we still have to do the body of work we have to do. That doesn't diminish. What I'm trying to figure out as to the nonprobate assets, what did you have to do just to find the 3% charge other than list them on the tax form? Well, we had to account for them, number one, and the executor did quite a bit of that work. But we had to account for them to make sure that they were delivered to the payable in death or whatever the case may be, that type of thing. So we had communications with that payable in death person. Everything else, we just had to account for them. It's hard to explain. Didn't Judge Pacey feel like you were double dipping because you charged 3% of the farmland as far as part of the gross estate and then you charged another 2% at the auction of the same farmland? My 3% when I set out to set the groundwork as to what I was going to charge was based on 3%. I didn't know what the executor, the executor and I had worked together on other estates before. I didn't know if he wanted to do a sealed bid auction or did not want to do a sealed bid auction. I may have been out of the picture on that sealed bid auction. That sealed bid auction, the auctioneer may have only gotten the appraised value. I don't know. Then my fees based on the totality of the gross estate would have been far reduced as well. But I don't know where he thought the double dipping was occurring because just like in the Parlier case, I think the attorney, I believe his name was Wilson, was asked if you had to go out and sell real estate in addition to those fees, which was 3% I think, would you have charged extra? Yes, that's just something that's customary to do. If you have to go out and sell, when we do an estate, we do the 706 and everything else that's in that estate and we focus in on all the matters of the estate. To go beyond that, to sell farmland or do something else, then that is either the executor's job to say, okay, I'm going to go out and, for example, on the car, the van that was a disabled van, he went out and got that sold at one of the dealers, dealership. So, I mean, that's something extra. Now, I don't consider that to be double dipping when I have to go out and do a sealed bid auction. And I'm not sure the trial court realized how much work was involved in that sealed bid auction and also what was entailed, what that entailed. But didn't you have a hearing down there? Didn't you have a hearing on that issue? Yes. So, when you say you don't know that the trial court realized. Well, I don't know. I don't know. I got the feeling that Casey is coming out of Ford County and goes over to McLean County quite a bit. I don't know if Ford County, and I practice over in Ford County, I'm not sure they do that as much as Livingston does or McLean County does on the sealed bid auction. So, I'm not sure his familiarity with the sealed bid auction was that great. Well, I think the question Justice Pope was asking is, isn't it your obligation to, through testimony, to make him aware that the sealed bid auction, one, just stated it's an extra duty. Okay. But then what does that extra duty entail? Like converting it to billable hours. Because earning the fee isn't necessarily bad if it's more than billable hours, but at least then you have a comparison. And I'm not saying that billable hours would be the standard, but I'm saying some testimonies, this is what we have to do in order to conduct a sealed bid auction and to make sure the appropriate parties are present and that we're going to get good bids and that we're going to, you know, the advertising we have to do, whatever it is you have to do. Do I have to communicate with other attorneys' offices? Do I have to communicate with realtors? Do I reach out to farmers that I know? If I were sitting as a trial judge, I used to hear probate cases. I don't know what's required in a sealed bid auction, and I sat in McLean County for a long time. The evidence, to go back to the record and the volumes, the evidence is replete with that exact information. I sent, when I do a sealed bid auction, I know about 22 farmers out there that over the years, 20 years I've been doing this, that want to buy land. So I sent out a letter. That's evidence. I showed Judge Pacey that. I gave an account of all the things I did to get that sealed bid. I traveled to grain elevators in the various regions around this farm ground, Anchor, Colfax, all that area, and I made up flyers, and I put up flyers. I talked to the farmers in the grocery stores, grain elevators, fertilizer companies. That is what is entailed. I want to get a good price. And we normally know some of the farmers who are the big-time bidders, so we want to go from there. And the result was $1,200 an acre more. It was a good result. If there had been a separate auctioneer, would you have still been responsible for ordering the title work, preparing the deed, doing the closing statement, the green sheet? Yes. White sheet now. White sheet, yes, right. Yes. Yes. That doesn't change. That doesn't change. And I've had experiences where auctioneers come back and they don't get a bid. You know, there's a level the bid can be rejected by the executive. They don't get a bid. I've had sealed bid auctions where they don't get a bid. And the guy in the highest bid comes back and he says, okay, Mr. Brucker, what is it going to take to get this land? And I say, we've got to have this amount. He goes, okay. And the land is sold right there. So it's outside. But the sealed bid auction, in my experience, and doing it for 20 years, people know that we do these things. And they come up and say, is there any more estates where land is going to come up? Farmers do look at plant books to see what's next to them, who dies and everything else. That's what happens outside in the rural community, believe it or not. So they also use me as a voice to say, okay, if there's anything out there, let me know. It's attorney's fees. When I say it's an auctioneer, I don't have an auctioneer license. It's attorney's fees. Sometimes, like I said, we'll get in there and it's just two people across the table. Like anything, all you need is two people bidding against each other to have a good sale. We believe the amount of work the executor did and the amount of work that I did in this estate warrants the fees that we charge. There's no prohibition under the rules of professional conduct. There's no prohibition that we know of under the 11th Judicial Circuit on the case law. The Morgan, Washington case was a contingent fee. I like to say it's very similar to what we charge on a 3% when we handle a large estate like this. You never know what's going to evolve. It's a lot easier to say, okay, what should have been billable hours? Well, how do you bill talking to a farmer in a grocery store saying, yeah, I got some farmland? We understand it's a case-by-case decision, but we believe that the evidence more than showed we had enough there to warrant our 3% for executor's fees and attorney's fees. And also, the evidence was, by the way, unrebutted. Unrebutted by anybody. We had an expert testify, yeah, this is customary. That's what the rules of professional conduct says. What is customary in the community? That's what's customary. Unrebutted. Unrebutted evidence. And so, we believe this is abuse of discretion and erroneous reliance on the green card. Were you under the impression that Judge Pacey thought there was a prohibition against charging I was under the impression, exactly. I think he heard of Goldfarb, and everybody hears of Goldfarb. In our opinion, Goldfarb has no application of this whatsoever. It's federal law and antitrust, and that's all it was. And there's plenty of other 11th Judicial Circuit cases, including the Parler and the Morgan case that followed this fatal thought. And you get out right now, and law enforcement is everywhere else. People want alternative means of billing. They don't like that bill of office. And so, no, we believe it was abuse of discretion and unjustifiable reliance. Counsel, when I first started practicing law, there was a fee book that most lawyers had. Those aren't around anymore, are they? No, well, McLean County used to have a 1971 that a lot of lawyers used to get. We don't use that. I think I've seen that. Ours is a flat fee. It's a percentage. It's based on a percentage. And it's based on, we have to analyze. So is the reason those aren't used any longer because of Goldfarb? I couldn't answer that. I don't know. I don't know. Thank you, Counsel. We'll hear from you on rebuttal. Good morning, Your Honors. May it please the Court. I'm Mary Welsh. I'm here on behalf of the Attorney General's Office. I actually can answer your question, Judge Turner. The reason I believe that people don't use fee schedules anymore is this Court's decision in First National Bank of Decatur that it is now well established that fees may not be set on fee schedules. So that answers the question. That's post-Goldfarb. The problem with the cases that Counsel cited, Palmier and Martha Washington-Holm, is that both of those cases predate First National Bank of Decatur. And both of those cases actually recognize that Goldfarb was changing the landscape and that you couldn't use fee schedules anymore. But before I talk about the reasonableness of the fees, and that's the central question here, really the threshold question is jurisdiction, public jurisdiction. And as the Court knows, the Notice of Appeal and the briefs are written for the estate. That was the named party in this appeal. And the problem is that the estate is not aggrieved by getting $175,000 back in its coffers. And this is why also the misnomer argument doesn't work because the executor in his capacity as executor is also not aggrieved because he should be happy as the executor's representative to get the $175,000 plus back into the estate's coffers. So really the only two people who are aggrieved are the executor in his individual capacity and the attorney in his individual capacity. But neither of those people filed a Notice of Appeal. So because the party that was aggrieved or the non-parties that were aggrieved by the order in this case did not file the Notice of Appeal, there is no appellate jurisdiction here. And although counsel relied on the Perona case, in fact the Perona case was vacated. So there's a problem there. And in his other case, the estate of, what was it, the estate of Guinier case, that case is a pre-1935 case. And the problem with that case, though, of course, is that pre-1935 appellate court cases have no precedential value under the Supreme Court's decision in Bryson, which for the site is 174 ill second 77. So to sum up, there is no appellate jurisdiction here because the only parties who were aggrieved did not file a Notice of Appeal. And the party that was not aggrieved, the estate or including the executor in his capacity as executor, were not aggrieved. And so they couldn't appeal. And the courts have been very particular about Notices of Appeal. For example, there are cases where if you have two losers in the circuit court and only one is named in the Notice of Appeal, only that person is the appellant. So appellate jurisdiction is taken very seriously by the courts. And here there simply is no appellate jurisdiction. But let's say, for the sake of argument, that there is. Here the circuit court did not abuse its discretion in finding that the fees that the executor and his attorney had been paid were unreasonable. And I think if you do the math, you realize how completely unreasonable these fees were. For example, and let's remember first that neither the executor nor the attorney has challenged the hourly rates that the circuit court set. So at $275 an hour to earn the over $170,000 fee, the attorney would have had to work 680 hours in nine months. I thought the court said 250 an hour was the appropriate amount. I'm sorry, 250 an hour. Right, you're right. I'm sorry. So 680 hours. That in over nine months. So think how many weeks that is. That's what, 17 weeks? Over nine months. That's half he would have had to be spending. These are 40-hour weeks. Half of his time on this estate. And the circuit court properly concluded that he had not put in enough time to earn this money. Can't parties reach an agreement as to how the attorney is going to be paid? And can't part of that be based on a percentage of the estate? Well, your Honor, in the end, it's the statute that counts. In fact, a retainer agreement is really not relevant, as we say in our brief. The agreement is not relevant to the determination of the reasonableness of the fee. And neither is an attorney's own opinion about his own, about the reasonableness of his fee. The factors under Thorpe, well, one of the most important factors is good faith. And I think we have to remember here that as a factual matter, which is against the manifest weight question, the circuit court here found that these fees were not sought in good faith. The second most, another very important factor, the most important factor under Thorpe, and under all the reasonable fee cases, is the time expended. And that's why the circuit court thought very hard about the hours that would have been expended. For example, the executor himself said, I spent 500, maybe 600 hours on the estate. He would have had to spend 1,600 hours to earn the fee that he sought, 1,600 hours over nine months. And he already had a full-time job. You said the trial judge said these fees weren't in good faith, but isn't it correct this trial judge has approved similar fees in prior estates on more than one occasion based upon a percent? There was evidence of one case that he had approved a fee, but the court itself said, this case, this case, our case, is not like that case at all. That was a highly contested will litigation contest. And so he said, you can't compare this case with the case that you're trying to present as evidence. So the circuit court itself was very clear about this. And so when you translate, I just want to make clear that when you 680 hours for the attorney, 1,200 hours for the executor over only nine months, the circuit court was quite within its discretion to determine that those fees were not reasonable. So what did it do then? It looked at the reasonableness figures. And it also said, to hit the bull's-eye point, fee schedules simply cannot be used. And the argument here has consistently been, we always do this when we have an estate large enough for, we always charge 3%. He said that in his letters to the charity. The attorney said that in his letters to the charity. And it was also in the testimony, and it was even here today. This is what we always charge when we have a fee, when we have an estate that's large enough for a federal tax return. But that kind of one-size-fits-all, you know, fee setting, fee scheduling also, doesn't make sense under Thorpe, which says you have to look at the facts of each case. And most important of these facts is the time expended. Now, again, the executor said, I spent five or 600 hours, and yet he was charging for 1,200 hours. I'm sorry, 1,600 hours, which is more than twice, three times, what the circuit court determined that he had actually spent. You know, from his testimony, he testified about what he did, as did the attorney. Similarly, the court looked at the other factors. It found, for example, that there was a lot of duplicative work, for which you cannot charge. It also found that there was no evidence that this case was, this estate was particularly complex or unique. You know, there were no thorny evaluation problems. There were no missing, you know, stock certificates. There were no missing, you know, relatives that couldn't be found or lived out of the country. There was no real property in another state or another country that would pose problems. There were none of these problems that make an estate truly complex in this case. All you had, you had a bunch of certificates of deposit. You had some real estate. That was pretty much it in this, some cash. And that was it for this estate. So it was really quite, and remember, it pretty much tied up within nine months. And I mean, I know estates that have gone on for ten years that were less money than this. So, you know, so when you think about the complexity of this case, it really wasn't there. And that was another factual finding of the circuit court. Remember, the circuit court's factual findings are entitled to, you know, significant deference because they're determined under the manifest weight of the evidence standard as part of their, the circuit court's determination of reasonableness. So in addition, the benefit to the estate, now the counsel said that, well, there was a significant benefit to the state because he charged a lower percentage than he testified that auctioneers charged. Well, in fact, the expert, the other attorney who testified, said that he knew that auctioneers do charge 2% at the low end. So there was no savings to the estate from 2% auction fee to a 3% auction fee because, in fact, the testimony was that 2% was a fee at the low end for sealed bid options in this locality. In addition, the counsel talked about the difference between the appraised value of the farmland and the sale value of the farmland. The appraised value was 5,300 an acre. The sale value was 6,500 an acre. And he's saying, well, that was because of my sealed bid auction. But, in fact, before they decided on the sealed bid auction, the counsel and the executor agreed that the appraisals were too low, which is not uncommon when you're appraising an estate for tax purposes that an appraisal will come in too low when compared to the actual market value. So, in fact, and also counsel testified at trial, fortune was with us because we beat the dive in the real estate market. So really it was not due to counsel's particular legal skills that there was an increase from between the appraised value and the sale value of the farmland. So it was not his, he was not the cause of the benefit to the estate between those two, the $400,000 or so difference between the appraised value and the sale value. Now. You're not arguing that there's anything improper about an attorney conducting a sealed bid auction at 2%. Well, no, we are. Actually, our brief did mention that, and I noticed that counsel didn't mention it in his reply brief, didn't answer our arguments about that, about the double billing problem that the circuit court found here. And also. Your argument is that it isn't per se 2%, it's just that it already charged 3%. Correct, correct, correct. And also, I mean, you know, the notion that you can charge $275 an hour for putting up flyers, as counsel was just saying he did, or for talking to people in, you know, in grocery stores doesn't seem to be a reasonable thing to charge an estate for. I mean, he was, you know, he's saying, you know, I did all of these things, and yet, you know, when you translate that into hours and dollars, you know, that's $200, I can't remember what it was, $250. Would the auctioneer have been required to testify as to what he did if he were hired by the estate for 2%? And what you said is at the low end, and it might have been 3 or 4 or 5 or 6, would we require the auctioneer to testify as to how much work he did before we decided whether the estate was justified in paying that fee to assist in the farmland auction? Well, Your Honor, there's a difference between an auctioneer and an attorney for an estate. An attorney for an estate is bound by the statute, the Appropriate Act, which allows him to charge only reasonable fees. I assume that there's a – or I don't know. I mean, I don't – you know, I mean, I think that real estate agent charging 6% when, you know, it's sold like that doesn't make any sense when, you know, some real estate agents charge – they all charge 6%, at least in Chicago, and, you know, some people sell in a day and some people sell in 6 months, and obviously the amount of work that's done is different. But that's like a contingent fee question. I mean, and here, really the question is – Is it paid if the land doesn't sell or if it sells for a lesser amount than the parties wanted? Well, I mean, certainly the 2% goes down if it doesn't sell for what they – Right. Right, for what they hope. So it's sort of like a contingent – That goes down. Right, so it's sort of like a contingent fee in that way. And, you know, and contingent fees are acceptable in certain circumstances like, you know, personal injury and so on for lawyers, but they're not acceptable here because it's a reasonable – the state, you know, the Probate Act makes clear that you can charge only a reasonable fee. And, again, the courts have been uniform in holding that the most important factor in this equation in determining reasonableness is the time expended. And the circuit court judge here, an experienced circuit court judge, who has done, you know, his – certainly his fair share of estate cases determined that the reasonable number of hours spent by counsel on this case, you know, was not the number of hours that he was charging for. Because in the end, I mean, you have to translate – I mean, if you say that the – if you recognize, and we must, that you can't say I'm using a fee schedule and I'm charging 3% because it's custom – it's what we always do and it's what's done in my region. Because that's a Goldfarb First National Bank of Decatur problem. So when you translate then the 3% plus the 2%, you know, into dollars and hours, you know, you get 680 hours over nine months for the work on this estate, including the auction. And the circuit court determined, having heard all the evidence, that 680 hours was not correct. That 300 hours was the more reasonable amount of time that had been spent on this estate by the attorney. Similarly, the court found that regardless of what banks might charge to act as executors, there was no testimony at all what individuals even customarily charge as executors. So – and the court looked at – took, you know, the executor at his word, 500 hours, set an hourly rate, which has not been objected to, and determined what that fee was, the 375. So in both cases, the circuit court took into account the factors, the reasonableness, not the single factor that counsel took into account, which is, I have to file a federal income tax form. And that was the only factor that he took into account. If you prevail, will an amended 706 return be required since, according to counsel, they deducted the amount of fees in dispute here? I think it's well over the amount, Your Honor. What? I think it's well over the minimum for the federal tax return. I mean, you can check with counsel. But my understanding is that regardless of the fees that were – I mean, if the fee were zero – I'm saying if they – if you prevail, too much was deducted, so will they have to file a new return, an amended return? Oh. Does that make any difference? You know, I have to say I don't know tax law well enough to tell you that, the answer to that question. Counsel probably does. I thought you meant would it go so – would the estate amount change so that the need to file a tax return in the first place would be different, and the answer to that would be no. Well, the reduction in attorney fees was about how much? Fifty – no, $100,000. And for the executor? Twenty-three-five, I think. So it would be – No, I'm sorry, $83,500. Well, if I understood counsel correctly, then the deduction, well over $100,000, if we reduce it here, it would seem to me would require now an amended 706. I would think so, but, again, my knowledge of tax law is not good enough to answer that question with any confidence. I just want to come back to the auction sale. I guess I should disclose that I've actually purchased farm ground at sealed-debt auctions, and I've represented clients where I have sold their ground at sealed-debt auctions and charged 2%. So as I understand your argument, though, it's not the 2%. It's the fact that the value of the farm ground was included to determine the 3%, and then you're saying that the additional 2% for the auction is improper because it's the double claim there. Right. That's exactly right. Right. Well, right, because when you charge 3% – and 3%, remember, are the gross assets, not the net assets. It included the non-probate assets for which, as the court suggested, very little work had to be done. And it was approximately 25% of the value of the estate was the non-probate assets. So there was that problem. But in addition, the 3%, which, again, was so many hours, even that was more than the circuit court found. It had been spent on everything that was done, including the lawyer work and the auctioneer work, which was not really lawyer work, because you don't need legal skills to run a sealed-debt auction because most auctioneers are not lawyers. So, again, and the circuit court expressed a lot of concern about the notion that an attorney would be charging attorney rates for conducting, you know, for non-attorney activity. But the – and, again, I think it's telling that the executor himself testified that he felt he did not – he would not charge extra for his work on the sealed-debt auction. It was only the attorney who charged for extra work on the sealed-debt auction. So that was, I think, another piece of evidence that the circuit court took into account about what is reasonable to do with regard to this sealed-debt auction, which was, you know, again, in addition to the lawyer work involved in the sale of any real estate. Thank you, counsel. Thank you. We ask that the court affirm. Thank you. Mr. Brocker, we'll hear from you on rebuttal. To answer your question, Justice, we would have to amend the 706 return. And this is a – Could you estimate how much that would then cost the state in additional tax? Not at this time, Judge. Okay. Doing that 706 and everything else, it's a compilation of things. But this is after the IRS has already approved our fees. And that's one thing that I think the trial court – I want to emphasize this. I think that's one thing the trial court just totally didn't consider. Nor did he – in my opinion, did he consider our expert, which is unrebutted. Nor did he consider that over my experience in 11th Judicial Circuit in Livingston and McLean counties, I have had other states, which we brought into evidence where 3% was charged. The other judges signed off on it, had no problem with that. It was like they couldn't – going back to 706, when you do a 706 return, you also have to get the approval from the Attorney General's office on a Form 700. The Attorney General approved the 706 return as it was filed, which had our fees and the executor's fees in there. And on that Form 700, if you take a look at it, they excuse or discharge any personal liability on the executor for any penalties and interest, etc. So he's out of the woods, based on when they signed that Form 700. But now they come back in after they've signed that Form 700 and said our 706 is okay. Then they come back and they pick up an out-of-state litigant or a legatee and say, we'll do your work for you. And by the way, this may garner a new amended 706 return. So what is the Form 700 piece of paper worth that we have to comply with as a lawyer out there? We have to get approval from the IRS. We have to get approval from the Attorney General. What is that Form 700 worth? After they put that in there, then they come back and say, wait a minute, your fees aren't good enough or your fees are too high. You've already said it. You've discharged my executive. Did you make that argument to Judge Pace? Yes, I did, over and over. I asked for it. I said that the Attorney General waived coming back in on this case after they filed that Form 700. And the trial court didn't consider it. But getting back to the appraised value of that land. Yeah, we could have said, okay, I know plenty of farmers out there say, here's the appraised value. Do you guys want this? It's yours. I can sell it to them, just like that. But the executor and I have been together on many occasions on other things, and we said, no, this appraisal is too low. Farmland is going up, just like it did. And I say, I think we can do a better job with an auction, either a sealed bid or an executive. That's why, you know, I don't know when she says it takes lawyers' skills. Yeah, believe me, when I go out there, and my experience and skills and everything else, when I go out there and I meet with farmers, and I know farmers in the community, I think that's a skill, and how do you put a price tag on that skill? By billable hours? I don't think so. Yes, I think this is a total abuse of discretion. I think the trial court relied on erroneous law, parler, and just to answer her, it's not a fee schedule we're doing. It's a percentage, a flat fee. All the cases they cited, and Judge Pacey, I think, put back this old gold-farbed fee schedule. We're not doing a fee schedule here. It's a flat fee. So I ask that the circuit court be reversed and that our fees be affirmed. Let me ask you, counsel, one question. Your expert did testify. He testified as a practice. Did he testify? Was he asked a question and did he answer that the fees based on this estate in this case were reasonable? No, we didn't ask that. I was trying to comport with what the rules of professional conduct are responsible. He says, hey, what is customary in the community, that type of thing, and that's what I got. And he said, it's customary two, three, it equals even, I'm sorry, on attorney's fees. He said three, four, and even five he did. And he also talked about other things. But I didn't ask him that. I didn't ask him to review this. But it was just for the customary practice. And that was, in my opinion, was ignored by the trial court. Thank you. Thank you. Thank you, madam under adviser.